## JOHN CHEEVER *et al. versus* GEORGE PEARSON *et al.*

Where a parish, in which there was no settled minister, leased the parsonage land for 999 years, it was *held*, that the lease vested in the lessees such rights of entry and possession as the parish had, whatever might be the effect of the lease as against a successor in the ministry.

A parish voted, that " B. and others have liberty to erect a seminary house on the parsonage land within what is hereafter described the seminary yard, with liberty to remove the same at pleasure, and that they have the land from the road &c., for a seminary yard." It was *held*, that the vote created a tenancy at will; but that if *it was equivalent to a license*, such license was revocable *so far as it* re- mained executory and looked to future acts.

TRESPASS *quare clausum.* The writ was dated February 11, 1833.

The parties stated a case.

On March 14, 1821, a subscription paper was signed by Ezra Brown, Benjamin Hitchings, one of the defendants, and others, setting forth that the subscribers thereto agreed " to build a seminary house on the parsonage land," having ob- tained liberty from the parish for the purpose, agreed to divide the property in the building into shares of five dollars each, and to pay respectively the sums of money set against their respective names.

A meeting of the first Congregational Society in Saugus, (which was the parish referred to in the agreement,) was held on May 12, 1821, in pursuance of a warrant, which stated that the meeting was called " for the purpose of acting on the following article, agreeable to a petition of Benjamin

Hitchings and others." At this meeting, the following vote, which was in substance copied from the article in the warrant above referred to, was passed : " Voted that Ezra Brown and others have liberty to erect a seminary house on the parsonage land within what is hereafter described the seminary yard, with liberty to remove the same at pleasure, and that they have the land from the road over the knoll back to the wall, and from the west end of the house to the barn inclusive for a seminary yard, with the exception of a carriage passage-way from the house to the road and to the barn, to be common to the occupier of the house and seminary building, and that each have a passage-way and the use of the pump."

The building was erected in 1821, on the parsonage land, by the subscribers to the agreement, who formed themselves into an association and continued from year to year to choose a clerk, directors, &c., for the purpose of taking care of the building. The defendants were directors at the time of the alleged trespass. The building was one story high, about thirty-four feet long and twenty-six feet wide, on stone underpinning, with a cellar of eight feet depth under about half of the building, and stairs leading into the cellar ; and there was a brick furnace in the cellar, to warm the whole building through tubes.

On March 4, 1830, a resolve was passed by the legislature, on the petition of the parish praying for leave to sell their ministerial lands, by which the parish were authorized " by a committee to be duly chosen by them for that purpose, to make sale of the real estate in said Saugus belonging to said society, or such part thereof as they may think proper."

Previously to October 3, 1832, a committee of the parish gave a verbal notice to the proprietors of the building to remove from the land of the parish, in one week, whatever belonged to the proprietors ; and on November 5, 1832, the committee gave the proprietors a notice in writing to the same effect.

On January 14, 1833, the parish, by a committee chosen for the purpose, leased the land on which the seminary stood, to the plaintiffs, their heirs, &c., during the term of 999 years.

Cheever
v
Pearson.

*Cheever*
*v.*
*Pearson.*

On January 29, 1833, the plaintiffs, after a demand on the directors to deliver to them the key of the building and a refusal by the directors, forced off the lock and affixed a lock provided by themselves. On February 1, 1833, the defendants entered the close, removed this lock, and placed another upon the door ; which was the trespass complained of.

There was no settled minister of the parish in 1821, 1832, or 1833. Ezra Brown died in February 1829.

If the Court should be of opinion, that the action could .be maintained, the defendants were to be defaulted ; otherwise the plaintiffs were to be nonsuited.

*Nov  4th.*

*Choate*, for the plaintiffs, to the point, that the vote of the parish operated as a lease to Ezra Brown, either for life or at will, or as a license, executed indeed so far as respected the building, but executory as to every thing else, and therefore revocable, cited *Regina* v. *Winter*, 2 Salk. 587 ; Com. Dig. *Estates by Grant*, H 1 ; *Roe* v. *Lees*, 2 W. Bl. 1173 ; *Cook* v. *Stearns*, 11 Mass. R. 533 ; *Fentiman* v. *Smith*, 4 East, 108 ; *Wells* v. *Banister*, 4 Mass. R. 514 ; *Washburn* v. *Sproat*, 16 Mass. R. 449 ; *Doty* v. *Gorham*, 5 Pick. 487 , *Right* v. *Proctor*, 4 Burr. 2208 ; that whether the interest of Brown was that of a tenant for life, or at will, or at sufferance, or whether the vote was a mere license, such interest terminated at his death, or at least after notice, *Rising* v. *Stannard*, 17 Mass. R. 284 ; *Ellis* v. *Paige*, 1 Pick. 43 ; Cruise's Dig. *tit*. 9, *c*. 2, § 1 ; *Web* v. *Paternoster*, Palm. 71 ; *St*. 1825, *c*. 89, § 4 ; that Brown had an estate, under the vote, expressly at *his* will, and consequently that it was at the will of the other party, Co. Litt. 55 *a* ; Cruise's Dig. *tit*. 9, *c*. 1, § 9 ; 10 Viner's Abr. 396, *Estate*, (*S. b.*) ; and that as there was no settled minister in the parish at the time, the lease of the land by the parish to the plaintiffs was valid, subject however to the right of a future minister, *Weston* v. *Hunt*, 2 Mass. R. 500 ; *Brunswick* v. *Dunning*, 7 Mass. R. 445.

*Saltonstall*, *B. Merrill*, and *Lord*, for the defendants, to the point, that the vote was equivalent to a license, and that as the license was executed, it was not revocable, cited *Webbe* v. *Paternoster*, 2 Rol. R. 152 ; Viner's Abr. *License*, E

*Winter* v. *Brockwell*, 8 East, 308 ; *Tayler* v. *Waters*, 7 Taunt. 374 ; *Francis* v. *Boston and Roxbury Mill Corporation*, 4 Pick. 365 ; *Ricker* v. *Kelly*, 1 Greenl. 117 ; *Liggins* v. *Inge*, 7 Bingh. 682 ; to the point, that a corporation may be bound by its acts, without vote or deed, *Canal Bridge* v. *Gordon*, 1 Pick. 297 ; as to the right of the defendants to go to the building, *Harrison* v. *Parker*, 6 East, 154 ; and to the point, that the lease was void, because it was not made in pursuance of the authority granted to the parish by the legislature, *Roe* v. *Prideaux*, 10 East, 158 ; Shep. Touchst. 269

SHAW C. J. drew up the opinion of the Court. When this case first came before the Court, it was complicated with a number of facts and questions respecting the rights of the parish, and the powers of their respective committees and agents, which, upon consideration, do not appear to affect the real question. The action is trespass *quare clausum fregit*, and both parties substantially rely upon their respective titles and the right of possession derived from them. The plaintiffs claim as lessees of the parish, and it was contended in behalf of the defendants, that as the lands were parsonage lands and the fee not in the parish, but in the minister, the parish had no right to make a long lease of the lands for 999 years ; and as they had not followed the authority conferred upon them by the act of the legislature, which was, to sell and not to lease the estate, the lease was not rendered valid by that legislative act. But the only question now is, whether, at the time of the lease, and from that time to the commencement of this action, the parish had the right of possession, because, if so, their lease conferred a right of possession on the plaintiffs, whatever else might be the legal effect of it, and that right of possession was sufficient to enable them to give the notices and make the entries relied on as the basis of this action.

It appears by the facts agreed, that if the lands were, as contended by the defendants, strictly ministerial or parsonage lands, of which the fee is in the minister for the time being, still when there is no settled minister, the fee is in abeyance, and the custody and right of possession is in the parish. *Weston* v. *Hunt*, 2 Mass. R. 500 ; *Brunswick* v. *Dunning*, 7

Mass. R. 445. It is found in the present case, that there was no settled minister in the parish at the time, and the parish has continued vacant to the present time. Whether the lease will be valid or not, against a successor in the ministry, should one ever be settled in the parish, is now immaterial; the parish having the right to the rents and profits and to the custody and possession of the estate in the mean time, their lease was not void, but without the aid of the authority of the legislative act, was sufficient to vest in their lessees such right of entry and possession as they themselves had. The question therefore is upon the title relied on by the defendants.

The defendants rely upon the grant, license or permission given to Ezra Brown and his associates, by a vote of the parish passed May 12, 1821, for the purpose of erecting a building on the premises, for a school or seminary; and the defendants claim as owners of the seminary building. This vote, passed in pursuance of a sufficient article in the warrant for that purpose, was to this effect: that Ezra Brown and others have liberty to erect a seminary house on the parsonage land (describing it), with liberty to remove the same at pleasure.

Several of the questions raised in the case, it appears to us, it is not necessary to decide, as whether this vote vested any interest, or conferred any authority upon any person other than Ezra Brown, whether general evidence *aliundè* was admissible to show who were intended by the word " others," and whether the mention of the name of Hitchings in the article in the warrant, taken in connexion with the vote, so referred to the written subscription paper, signed by Hitchings, Ezra Brown, and many others, as to make that paper evidence of the persons intended by the vote. For we are of opinion, that this cause may be decided upon other and different grounds. Giving the full force and effect to the vote of the parish, in the same manner as if the names of all the builders and proprietors of the seminary had been named in the vote, and admitting for the purposes of this inquiry, that the vote of an aggregate corporation, constitutes a memorandum or agreement in writing within the provisions

of the statute of frauds, we must still examine and construe this vote to ascertain and declare its legal effect  Taking the whole vote together, as we must do, when we are construing it as the only evidence of the contract of the parties, in order to understand what was their intent, it appears to us very manifest, that it was not the intention or understanding of either of the parties, to grant away the parsonage land itself, but only the use of it to the extent and for the purposes indicated by the vote.   The leading purpose of the vote is expressed in the first clause, which gives Brown and others liberty to erect a seminary house on the parsonage land, within what is thereafter described as the seminary yard, with liberty to remove the same at pleasure, and that they have the land from the road &c., with certain reservations of rights of way, *for a seminary yard.*   It was a right to erect the building and to use it as a seminary, with the appurtenances. But the right to enter upon, use, and possess the land of one at the pleasure of another, is a lease at will.   It is no objection to considering it as a lease, that no rent is reserved ; it was *quasi* public land, and the public benefit to be derived from the establishment of the school, was the real, and was probably deemed an adequate consideration.   But there would be the same objection in considering it as a grant of any other character, there being no consideration expressed, and none implied, except the public benefit in the promotion of education.

It is, in general, true, that all interests in the use and enjoyment of lands for uncertain and indefinite terms, are in construction of law leases at will.   But if one grant the rents and profits of his land to another, he is tenant at will.   Cart. 60.   So, if one give license to another to come upon his dock and carry on his trade, because it is all the proper profits of a dock.   *Regina v. Winter,* 2 Salk. 587.   So, a person in possession of land, under a contract with the owner for a purchase not yet completed, is tenant at will.   *Proprietors of No. Six v. M'Farland,* 12 Mass. R. 325 ; Com. Dig. *Estates by Grant, H* 1.

But in this case, this principle does not rest upon the general rule merely, though it is clearly within it, but also on

the terms of the vote. The license is given for the erection of a seminary building, by others than the owners, the use of the land and the yard appurtenant is granted for that purpose, and liberty is given to the proprietors, to remove the building at their pleasure. It cannot be doubted, that whenever the building should be removed by the proprietors, according to the right reserved, all their right under this vote to the use of the land would cease. The consideration for the gratuitous use of the land, namely, the public benefit to the parish, for the maintenance of a school there, would also wholly cease. The same consequence would result by a fair legal implication, from the whole of the vote, though perhaps not so plainly provided for in the terms of it, in case the use and purpose, for which the building was erected, were changed ; as if the proprietors had converted it into a manufactory.

If the use of the land was granted only until the building should be removed by the proprietors, and they were at liberty to remove it at their pleasure, it follows clearly, that it was a lease determinable at the will and pleasure of the lessees.

This being so, the rule is settled, and has been unquestioned from Lord Coke's time to the present, that every lease at will must, in law, be at the will of both parties. Therefore when a lease is made to hold at the will of the lessee, it must also be at the will of the lessor. Co. Litt. 55 a.

Applying these well established rules to this transaction, we are of opinion, that the legal character of the interest of the proprietors and builders of the seminary, was that of a tenancy at will, and of course, that it was competent for either party to terminate it in the mode prescribed by law. Whatever doubt there may have been, before the statute, as to the mode of determining the will, in case of a tenancy at will, having regard to the nature of the estate or other considerations, it is now clearly provided, that it may be terminated by either party in all cases, after giving to the other party, three months' notice. St. 1825, c. 89, § 4.

It appears by the facts stated, that a verbal notice was given by the officers of the parish to the proprietors of the seminary, on October 3, 1832 ; that a formal written notice

was given by the parish committee on November 5, 1832, that the lessees of the parish, the plaintiffs, entered on the 29th of January, 1833, more than three months after notice to quit, and that this action was commenced on the 11th of February following  The tenancy at will therefore had terminated, and the plaintiffs had the possession and right of possession, when this action was brought.

We think it would not present the case more favorably for the defendants, to consider the transaction in the other point of view, that of a license.  As a license for many purposes may be given by parol, and as the statute is express, that no interest in lands shall pass by parol, it follows, that the enjoyment or benefit to be obtained by a license, is not strictly an interest in the land.  A license, which is an authority given to do some one act, or a series of acts, on the land of another, without passing any estate in the land, is, in its nature, countermandable.  Still the distinction between a license executed and a license executory, is obvious and well founded in law. To say that an executed license cannot be revoked, is saying only, in other words, that an act lawful when it was done, in virtue of the license and permission of the owner of the land, cannot be rendered unlawful by a subsequent revocation of such authority.  And the license which legalizes the act itself, renders lawful also its incidents and necessary consequences.  But were it extended further, it would be a right to use the land of another without his consent, which is an interest in the lands.  These doctrines are clearly established and well illustrated in a recent case, in which the authorities are fully considered.  *Cook* v. *Stearns*, 11 Mass. R. 533.

To apply the doctrines of that case to the present.  Supposing the vote of 1824 to be a good license to the proprietors and builders of the seminary, so far as they acted upon it before it was withdrawn and revoked, it was valid, and their acts under it were lawful.  No action could be brought against them for entering the close, digging the cellar, erecting the building, and entering it from time to time to use and enjoy it, until the license was countermanded.  But so far as it remained executory, as it looked to acts still future, the license was revocable, and the acts and votes above cited

Cheever
v
Pearson.

as shewing the determination of the interest, regarded as an estate at will, are sufficient to revoke the license, so far as it was executory ; and the defendants therefore can find no justification for the entry made, and the act done by them, under such license.

*Defendants defaulted.*